FORD v. SECOND NAT. BANK et al.

No. 10288.

Court of Civil Appeals of Texas. Galveston.

Dec. 3, 1936.

Rehearing Denied Jan. 28, 1937.

E. T. Chew, of Houston, for appellant.

Conrad J. Landram, of Houston, for appellees.

GRAVES, Justice.

At the suit of the appellees (J. H. or Jack Rafferty as alleged holder and the Second National Bank as his pledgee thereof) against the appellant in his stated capacity as Denton W. Cooley's administrator, upon three promissory notes for $2,500 each, signed "Denton W. Cooley, Trustee," payable to A. C. Bayless, and expressly reciting upon the face thereof that they were secured by a deed of trust upon a specifically described tract of land out of the A. C. Reynolds league in Harris county, the learned trial court, upon a jury's verdict in response to special issues that Rafferty had paid Cooley a valuable consideration for the notes, that they had been indorsed to him by Bayless at the request of Cooley, and that it had not been the intention of Rafferty and Cooley in having the notes indorsed by Bayless to Rafferty that the latter was to sell them and deliver the proceeds thereof to Cooley, rendered judgment in appellees' favor against the

appellant for the full $14,197.61 then found to be due upon the notes, including interest and attorney's fees, together with establishment of the recited liens as validly existing against the described land, with also a foreclosure and order of sale thereof; it being further specially provided, however, that no general execution should issue against the administrator, nor should a levy be made upon any property other than the tract so decreed to be covered by the lien established, and that any deficiency upon the judgment—after a sale of that property at foreclosure—should be paid by the appellant in due course of administration by him of the Cooley estate.

In final substance the appellant contends in this court, as he did below, in effect, this:

(1) That the undisputed evidence showed that the tract of land—so recited and decreed to have been mortgaged to secure the payment of the three notes—had been deeded to Denton W. Cooley as trustee; that it was trust property in his hands for the benefit of others than, or along with, himself; and that, not only had both the notes and the deed of trust against the land been executed by Cooley to A. C. Bayless as "trustee," but, further, the notes had also been directed by Cooley to be and had been assigned by Bayless to the appellee, J. H. Rafferty, to discharge the personal debts of Denton W. Cooley to Rafferty; wherefore, such transaction was null and void, as being in contravention of R.S. art. 7425a.

(2) That the transaction having thus been invalid ab initio, the notes thus sued upon could not constitute a proper claim or debt against appellant as Cooley's administrator in favor of either of the appellees, especially since it likewise indisputably appeared that Rafferty had known at the time the transactions occurred of all the facts so rendering them invalid for such a use, and the bank had become his assignee thereof after the notes had all matured, after Cooley's death, and not being an innocent purchaser thereof for value, hence was in no better position than he.

This position is sustained as being supported by the record.

The documentary evidence showed that the property here involved, together with other tracts, had been conveyed to "Denton W. Cooley, Trustee," by Mrs. Emma Krenzler and husband by deed dated Sep-

tember 14, 1926, which had promptly gone to record in Harris county, neither the purpose of the trust nor the names of the beneficiaries, however, being set forth in the conveyance itself; thereafter, on September 1, 1927, these three notes, together with a deed of trust to this property running to Arthur O'Connor as trustee to secure their payment, the notes all maturing three years after date, were executed by "Denton W. Cooley, Trustee," the notes being payable to A. C. Bayless as payee, and, as recited supra, expressly declaring that they were so secured by such deed of trust; thereafter, the date thereof not appearing upon them, the notes bore the indorsement of the payee, A. C. Bayless, without recourse on himself, to the appellee here, J. H. or Jack Rafferty; still later, on October 11, 1930, the appellee Rafferty executed a written instrument reciting the transfer by him of all three of these notes, together with the mortgage lien securing the same, to his coappellee herein, the Second National Bank.

As interpretative of the meaning of these written transactions, the oral testimony of the two witnesses who had participated in and knew the facts concerning the transactions they reflected, that is, the appellee Rafferty and the original payee of the notes, Mr. Bayless, seems to this court conclusive of the whole controversy; they—together with Mr. Cooley, the maker of the notes and accompanying deed of trust—were very close friends and operating in business together during all the material time here, up until the death of Mr. Cooley; both the survivors of that trio, Messrs. Rafferty and Bayless, in addition to such facts about their relationships to each other, testified that Mr. Cooley, having first himself executed the notes and deed of trust without the knowledge or consent of Mr. Bayless, presented them to the latter with the request that he undertake to borrow money upon them, acting for that purpose as accommodation-maker for Cooley, in order that the latter might pay off the personal debts he then acknowledged to Bayless he owed to the appellee Rafferty; that in pursuance of that request from Cooley and in the endeavor to get the money for that purpose for him, Bayless took the papers to Dallas and requested such a loan from the Southland Company, for which he was then general agent at Houston, but failed in the effort, and so reported to Mr. Cooley on his return from Dallas.

This further pertinent testimony from each of these witnesses is disclosed by the question and answer form of the statement of facts:

From Mr. Bayless:

"Q. At the time Mr. Cooley asked you to go to Dallas to negotiate the loan on these notes did he make any statement to you as to what he proposed to do with the proceeds of the loan? * * * A. Yes, he told me he and Jack Rafferty had this property and he owed Jack Rafferty some money and I objected to him making the notes payable to me. I did not know anything about the deal at that time. When I came in the bank the notes were already made out, he did not make them out when I came in the bank, they were already made out and he assumed I could get the money for him.

"Q. What did Mr. Rafferty have to do with that? A. He said he wanted to pay him off, that they had several deals that I did not know about, I was acting as a messenger.

"Q. Did you hear Mr. Cooley make a statement as to whether or not he owed Mr. Rafferty any money? A. Yes, sir, I knew he did.

"Q. Was Mr. Rafferty present at any time in which Mr. Cooley stated he owed Mr. Rafferty any money? A. I am not sure about that, we were usually together an hour or two every day, I do not remember about this transaction, but he told me Jack was mixed up in this deal with him and he and Jack wanted to get this money. I did not know he and Jack was together, they had so many deals together that I did not know, I did not remember, we were together an hour or two every day for years.

"Q. Who requested you to endorse the notes over to Jack Rafferty? A. Mr. Cooley.

"Q. Did Mr. Cooley give you any reason or explanation why he was endorsing the notes over to Mr. Rafferty? * * * A. He made that statement previously, but I do not think he made it at the time, except that he stated to me to endorse the notes over to Jack, I think that is all he said, because I kept the notes, I expect, six weeks afterwards, he did not ask for them and I had them in my office.

"Q. Did he make a statement why he wanted the notes endorsed over to Mr. Rafferty? A. He said he owed Jack some money, he did not go into details and it was

no concern of mine and I did not mind doing what he asked me to do.

"Q. Where did the actual delivery of the notes from you to Mr. Rafferty take place? A. In the Marine Bank & Trust Company on Texas Avenue."

Concerning such delivery of the notes, he added this:

"Q. Where were you when you endorsed those notes? A. I made them out, if I remember correctly, I made them out in my office in the Shell Building, and two or three days later I saw Jack Rafferty in the bank and finished endorsing them in the Bank, I left a blank space there.

"Q. You wrote the endorsement on the back of the notes and drew a line for the party to be filled in? A. Yes, sir.

"Q. And then you put Jack Rafferty's name on them, when you saw him in the bank? A. If I remember correctly that is the way it was.

"Q. You already had the information from Mr. Cooley, from your testimony, to endorse those notes over to Mr. Rafferty? A. Yes, sir."

From Mr. Rafferty:

"Q. What consideration did you give for the transfer of these notes? * * * A. A number of the deals Mr. Cooley and myself were interested in was the construction of three houses in Suniland Addition, and eight acres on the Griggs Road and one thousand dollars, cash, and the advance of this money in connection with this enterprise.

"Q. How were those items any consideration for the transfer of these notes? A. Mr. Cooley was to lend me money out of the Marine Bank to invest in the enterprises he and I were interested in, the loans were in my name and I was stuck for the notes at the bank and he always held an interest in the property and I have certificates to show it, I have some of those certificates here today.

"Q. How was that a consideration for the transfer of these notes? A. Taking one instance here, Mr. Cooley was furnishing the finances, by me borrowing the money from the bank.

"Q. I am talking about the three notes. A. I had so much of my money invested in the enterprises that he had an interest in and this is how we would square it up by giving me these notes to get me shomewhere on an even basis."

"Q. Did Mr. Cooley know Mr. Bayless had endorsed and delivered these notes to you? A. Yes, sir. * * *

"Q. Did you hear Mr. Cooley say anything to Mr. Bayless prior to the time Mr. Bayless delivered these notes to you about delivering and transferring them to you? * * * A. Yes, sir.

"Q. State what you heard Mr. Cooley say to Mr. Bayless. A. He said to endorse the notes to Jack, he said to endorse the notes to Jack because he owed me money.

"Q. Who is Jack? A. Me, Jack Rafferty.

"Q. Before you acquired these notes did you have any conversation with Mr. Cooley? A. Yes, sir.

"Q. About Mr. Bayless transferring and endorsing these notes to you? A. Yes, sir.

"Q. State what the conversation was. * * * A. I said, 'If we are going to get on an even basis, you should have Mr. Bayless endorse the papers to me in order to protect me on the investment,' and that was the consideration therefor.

"Q. At the time that conversation took place did Mr. Cooley make any statement to you about his owing you any money? A. Yes, sir.

"Q. Where did Mr. Bayless deliver those notes to you? A. In the Marine Bank & Trust Company."

"Q. If you did have these notes at the time he (appellant Ford) talked to you about it, you did not make a concrete claim about the notes, if you owned them at that time? A. I did not consider the notes applied against the estate (D. W. Cooley's), I wanted them to run to maturity and foreclose on the property, the estate was supposed to be insolvent, that was his statement."

"Q. Do you know for whom he (Denton W. Cooley) was acting? A. No, sir.

"Q. Do you know if he was acting for himself? A. No.

"Q. Were you present when your deposition and Mr. Schlesinger's deposition was taken? A. I was not with Mr. Schlesinger when his deposition was taken.

"Q. Were you present and did you not agree that Mr. Cooley was acting for himself? A. There was no agreement between Mr. Schlesinger, it was separate.

"Q. Did you know that the trustee was put on that because he was dealing individually on that property? A. I did not say it, I heard you say it.

"Q. Is it not your understanding that you knew Mr. Cooley was acting individually on all of the property himself, and you so stated to others? A. To the contrary, there was people interested in the property and he held it as trustee.

"Q. You do not know who it was being held for as trustee? A. It has not been proven satisfactorily in any court in this county yet."

From this testimony there stands out conclusively, if not undisputedly as appellant contends, these two facts:

(1) That Denton W. Cooley did hold this property in trust for different beneficiaries, just as the word "trustee" in the deed therefor from the Krenzlers to him imported, although their names were not disclosed therein, and whether or not either he himself or the appellee Rafferty were among them, which the witness Bayless in effect said he knew to be a fact.

(2) That, despite the fact that it was thus trust property in his hands as the designated trustee, he nevertheless undertook in the execution of the notes herein sued upon—as well as the deed of trust so securing them, which seems to have been lost—and the procuring of the passage thereof through his direction for their transfer to the appellee Rafferty, to thereby subject the trust property to the payment of his own personal obligations alone.

The development of this situation constituted a direct violation of the inhibition contained in the concluding portion of the cited statute, article 7425a; in the face of it the jury's findings became immaterial, and did not furnish a proper basis for the judgment rendered; wherefore, the action so taken below will be reversed, and the cause will be here rendered in favor of the appellant.

Reversed and rendered.

## On Motion for Rehearing.

The appellees' very ably written and earnestly presented motion for rehearing has been carefully considered, but the court is unconvinced of error in its former disposition of this cause; its two controlling fact findings—before made as standing out at least conclusively from the undisputed evidence—are vigorously but courteously assailed, mainly upon the contentions that the testimony failed to show the essential indicia of a trusteeship in Cooley for others in his tenure of the land, and that appellee Rafferty's formerly quoted statement that he did so hold it was a mere conclusion and opinion that could not be used as a basis for that fact finding that it was so held.

The statute itself originally applied herein to these two facts as so found before—Vernon's Ann.Civ.St. art. 7425a—seems to settle the first of these presentments adversely to appellees, in that the objective of its language appears to have been to apply that public policy of the state to just such partially disclosed trusts as the evidence our former opinion sets out shows this one to have been, it being as follows: "[Article 7425a. Conveyance by trustees] Where a trust is created, but is not contained or declared in the conveyance to the trustee, or when a conveyance or transfer is made to a trustee without disclosing the names of the beneficiary, or beneficiaries, the trustee shall be held to have the power to convey or transfer or encumber the title and whenever he shall execute and deliver a conveyance or transfer or encumbrance of such property, as trustee, such conveyance or transfer or encumbrance shall not thereafter be questioned by any one claiming as a beneficiary under such trust or by any one claiming by, through, or under an undisclosed beneficiary, provided that none of the trust property in the hands of said trustee shall be liable for personal obligations of said trustee. (Acts 1925, 39th Leg., ch. 120, p. 305, § 1.)"

In the face of this express declaration, it seems inept to yet argue that the word "trustee" following Cooley's name in these transactions—and despite the positive statement to the contrary of his partner and business associate in all the transactions to which that characterization applied, the appellee Rafferty—should be held to have been merely descriptio personæ.

The objection to appellee Rafferty's statement, on cross-examination, that Mr. Cooley had not been holding this property for himself alone but there were other people interested in it with him and he held it as trustee, was a mere inadmissible conclusion, is likewise untenable; that witness was not only a party to the suit—he was indeed the main party upon his side of it—but he had been the one most intimately associated with

Mr. Cooley in all these transactions, hence knew, if anybody did, the capacity in which Mr. Cooley held and was acting; the statement therefore, unobjected to at any time, was plainly receivable as an admission against interest by a party to the suit. 17 Tex.Jur., p. 543, par. 224, and footnote cited authorities.

Not only so, but he was corroborated in that statement by the only other living member of the triumverate concerned in these transactions between himself and Mr. Cooley, that is, Mr. Bayless, whose testimony with reference to it was also quoted in our former opinion.

■ The further insistence that there was any lack of necessary pleading in behalf of the appellant of the trusteeship of Cooley and of his having so subjected this property that he held in trust to liability for his personal obligations to the appellee Rafferty, is plainly contrary to the record in the cause; indeed, the appellees themselves made that averment in their own trial pleadings; thus that issue was affirmatively put into the cause by them and was tried out in consonance therewith by both sides, without any objection by either to any of the testimony brought out as responsive thereto (inclusive of Mr. Rafferty's statement), wherefore they were in no position to complain when it so came out conclusively from all the evidence that Cooley not only had been such a trustee, but had also made the trust property in his hands liable for his personal obligations to Rafferty.

The motion will be overruled.

Overruled.